LEONA KNIGHT ET AL V.
KAYE LOCKHART EDWARDS

No. A-4303. Decided February 10, 1954.
Rehearing overruled March 10, 1954.
(264 S.W. 2d Series 692)

*Benson & Howard,* of Lubbock, *Underwood, Wilson, Sutton, Heare & Boyce,* of Amarillo, *Looney, Clark & Moorhead, Chas.*

*D. Matthews* and *R. Dean Moorhead,* all of Austin, for petitioners.

The Court of Civil Appeals erred in holding that there is evidence of an insane delusion which requires that the question of testamentary capacity be submitted to a jury; that there is any evidence that Mrs. Lockhart was the victim of an insane delusion at the time she executed the will, and that there is any evidence that an insane delusion in any way influenced Mrs. Lockhart in her execution of the will. Brown v. Mitchell, 88 Texas 350, 31 S.W. 621; Green v. Dickson, 208 S.W. 2d 119, refused n.r.e.; Bagwell v. Shanks, 260 S.W. 222, writ dismissed.

*Trout & Jones, Klett, Bean & Evans* and *E. L. Klett,* all of Lubbock, for respondent.

In reply to points presented by petitioners cited Galindo v. Garcia, 145 Texas 507; 199 S.W. 2d 499; Board of Firemen v. Marks, 150 Texas 433, 242 S.W. 2d 181; Nass v. Nass, 149 Texas 41, 228 S.W. 2d 130.

MR. JUSTICE CALVERT delivered the opinion of the Court.

Petitioners are the proponents and respondent is the contestant of the will of Mrs. Lou Lockhart.

At the conclusion of the evidence, the trial judge granted the petitioners' motion for an instructed verdict and admitted the will to probate. The Court of Civil Appeals reversed the judgment of the trial court and remanded the cause for retrial. 258 S.W. 2d 877.

The basis of the contest was that at the time she made her will the testatrix lacked testamentary capacity because she was the victim of an insane delusion. The Court of Civil Appeals has held that the state of the evidence was such as to make that question a fact issue which should have been submitted to the jury, and that holding is the only one brought here for review.

The position of the respondent is that at the time she made her will Mrs. Lockhart was laboring under an insane delusion that she had "lost" her granddaughter (the respondent), and that by reason of this delusion she made an unnatural disposition of her property, failing to recognize the claim of respondent as a natural object of her bounty.

Mrs. Lou Lockhart, the testatrix, was the mother of three children, two, Mrs. Leona Knight and Jess Lockhart, by her first husband, and one, Mrs. Ernestine Watson, by her second husband, Judge G. E. Lockhart. Respondent, Kaye Lockhart Edwards, is the only child of Jess Lockhart, now deceased. Mrs. Knight and Mrs. Watson, the two surviving children, are the proponents of the will.

Jess Lockhart died intestate January 22, 1940. His daughter, the respondent, was born about four months thereafter on May 17, 1940. Judge G. E. Lockhart died intestate August 5, 1941. Mrs. Lockhart's will is dated May 26, 1942. By her will she left her "cluster diamond with sapphires around the setting" to the respondent, a "diamond ring having a large diamond in the center with four small diamonds on each side" to her daughter, Mrs. Knight, a "solitaire diamond bar pin" and a "diamond Eastern Star pin" to her daughter, Mrs. Watson, and all of the remainder of her property to the two daughters. Mrs. Lockhart died November 8, 1951. In 1945 respondent's mother, Mrs. Alma Lockhart, married A. P. Edwards who adopted respondent.

There is no need to review the evidence offered on the trial by the proponents to establish the testatrix' general mental soundness and capacity to make a will. Suffice it to say that the strength and cogency of that evidence was such, in the absence of evidence of a contrary nature, to put the matter beyond all controversy. But to establish that as to her the will was a product of an insane delusion, respondent relied on certain testimony now to be detailed, fortified by the opinion of a psychiatrist given in answer to a hypothetical question.

At the time of his death Jess Lockhart and his wife resided in the City of Lubbock across the street from Judge G. E. and Mrs. Lou Lockhart, where respondent and her mother continued to live for sometime following the death of Jess Lockhart and the birth of respondent. The record reveals that Judge and Mrs. Lockhart were extremely fond of and attentive toward respondent in the early months of her life, having her in their home frequently after her mother accepted employment following Jess Lockhart's death. The record further reveals, without controversy, that in due course the friendly relationship between respondent's mother and Judge and Mrs. Lockhart became somewhat strained and that the relationship between respondent's mother and Mrs. Ernestine Watson and her husband, Bill Edd Watson, became severely strained, leading finally to a telephone conversation between the mother and Mrs. Lou Lockhart in

which the future relationship between respondent and her grandmother and Judge Lockhart was discussed. According to the respondent, this telephone conversation was the basis of Mrs. Lockhart's delusion that she had "lost" her granddaughter. Respondent never again visited with her grandmother and Judge Lockhart, in their home or elsewhere, during Judge Lockhart's lifetime, although it may be noted that Mrs. Lockhart frequently through her remaining years inquired of her friends how respondent looked, what she wore, etc., and that respondent was taken to the Lockhart home for a short stay at the time of Judge Lockhart's death and was permitted a visit with testatrix on at least one other occasion in 1950.

Respondent's version of the aforesaid telephone conversation is that her mother only limited or restricted her right of visitation with the grandparents by forbidding them to ever ask for or have her in their home when Mr. and Mrs. Watson were present, the mother having theretofore insisted that they not have her at their home after five o'clock in the afternoon when she returned home from work. She points out that in spite of the fact that the right of visitation was only limited by the foregoing restrictions, Mrs. Lockhart nevertheless persisted in a false belief and delusion that she had been denied all right to see or visit the respondent and that she had therefore "lost" her.

Respondent's evidence that Mrs. Lockhart entertained the belief just mentioned is based on the testimony of three witnesses. Dr. V. V. Clark, personal physician and close friend of Mrs. Lockhart, testified that sometime prior to the death of her husband Mrs. Lockhart discussed the matter with him on the telephone and, while choked-up or crying, told him that "the child was just taken completely away from them"; that "she had been denied and deprived of the privilege of being with or seeing her grandchild," and that she might "never get to see her no more." Mrs. Morton J. Smith, a close friend of Judge Lockhart and the testatrix, testified that Mrs. Lockhart frequently talked to her of Kaye, and that there came a time when she "indicated by her conversation that she had the feeling that she had lost this grandchild." Mrs. Mamie Fite, a department store employee and a casual acquaintance of Mrs. Lockhart, testified that "in recent years" she had a casual conversation with her at the termination of which Mrs. Lockhart took the witness by the arm and said: "and I guess you knew that Alma (respondent's mother) wouldn't let me see my grandchild, didn't you?"

Respondent's contention that the testatrix' belief that she could not see her grandchild and had lost her was a false belief

and a delusion, but that she persisted in it in spite of evidence to the contrary, finds support in the testimony of her mother, Mrs. Alma Edwards, her adopted father, A. P. Edwards, her nurse, Mrs. Norene Salsbury, and Mrs. Fay Wiginton. Mrs. Edwards testified that other than the restriction on the right of visitation, heretofore mentioned, she had never been unwilling for Mrs. Lockhart to see or visit with Kaye and had never told her she could not see the child. Mr. Edwards testified that on one occasion he asked Mrs. Lockhart if she would like to see Kaye and upon receiving an affirmative answer told her that any time she wished to see her to call and "I'll bring Kaye to see you." He also testified that at his suggestion his wife wrote Mrs. Lockhart about 1947 and told her that she could see Kaye anytime they were in Lubbock "and if she would call Mrs. Fay Wiginton, we would get Kaye over to her." Mrs. Salsbury testified that she heard the telephone conversation between Kaye's mother and Mrs. Lockhart and heard Mrs. Edwards tell Mrs. Lockhart "that she could see Kaye at any time she wanted to, and she could have her over there when Will Ed and Ernestine were not there." Mrs. Wiginton testified that she told Mrs. Lockhart, during a conversation concerning Kaye, "well anytime you want to come to my house and see Kaye, or you want me to bring Kaye to you, I will."

Petitioners' version of the telephone conversation between respondent's mother and Mrs. Lockhart is reflected in the testimony of Mrs. Morton J. Smith, heretofore identified. She testified that prior to Judge Lockhart's death she had a conversation with him in Mrs. Lockhart's presence in which he told the witness that respondent's mother telephoned Mrs. Lockhart and, as the witness related Judge Lockhart's statement, "she just called up out of the clear sky, unexpected to them, and just said that she didn't want them to have anything more to do with the baby," and in the same conversation indicated that she was displeased with the fact that she had not received any money out of her husband's interest in a certain business venture. She testified also that on the same occasion Mrs. Lockhart said with reference to the telephone conversation "that she (respondent's mother) just called up and told them she didn't want the child to have anything more to do with them, that she was through." She testified further that she later witnessed an incident when respondent waved at Judge Lockhart, who was across the street, and he waved back, "and she tried to cross the street" but "Alma caught her" and "gave her one grand spanking," whereupon Judge Lockhart cried and threatened to have the mother arrested. This testimony was uncontroverted.

From the foregoing resume of the pertinent testimony it may be admitted that there was evidence of probative force that when she made her will Mrs. Lockhart was laboring under a false belief or a delusion that she had been denied all right to see or visit her granddaughter and that she persisted in that belief in spite of assurances that it was false and which should have removed it from a reasonable mind. But the fact that there is evidence that Mrs. Lockhart was laboring under a false belief or a delusion does not necessarily mean that there is evidence that she was the victim of an insane delusion. A delusion and an insane delusion, as that term is defined in law, are altogether different mental conditions. Denson v. Beazley, 34 Texas 191; Page on Wills, Lifetime Edition, Vol. 1, Sec. 143, pp. 293-295.

■ The courts of this state have defined the term "insane delusion" as being "the belief of a state of supposed facts that do not exist, and which no rational person would believe," and have had little, if any, occasion to enlarge upon that definition or to prescribe a more detailed or precise test. Vance v. Upson, 66 Texas 476, 1 S.W. 179; Prather v. McClelland, 76 Texas 574, 13 S.W. 543, 546; Lanham v. Lanham, 62 Texas Civ. App., 431, 146 S.W. 635, 640; Peareson v. McNabb, Texas Civ. App., 190 S.W. 2d 402, 403, writ refused, want of merit.

Text writers frequently state the rule to be that a delusion cannot be an insane one if it is founded upon any evidence whatever, their expression of the rule customarily being in substantially the same language as that used in 57 Amer. Jur., § 82, n. 92, where it is said: "To constitute a delusion sufficient to invalidate a will, the subject matter must have no foundation in fact, for there is no such thing as a delusion founded upon facts. An insane delusion must be a belief which is not founded on evidence, since if there is any evidence, however slight or inconclusive, which might have a tendency to create a belief, such belief is not a delusion. * * * The essential question is whether the testator had before him any facts on which his belief might have been founded, irrespective of the actual evidential force of such facts." See also Alexander's Commentaries on Wills, § 344, n. 464: "A belief without any support in extrinsic evidence": Schouler on Wills, Sixth Edition, Vol. 1, § 130, p. 150: A belief "based on no evidence whatever, as distinguished from a mistaken belief based on some sort of evidence." On the other hand, some authorities recognize that a delusion may be an insane one even though there is some slight evidentiary basis for the belief. Thompson on Wills, Third Edition, § 64, p. 112: A belief which no "rational person" would entertain; Page on Wills, Lifetime

Edition, Vol. 1, § 141, p. 291: "A belief in facts which no rational person would believe"; "a false belief for which there is no reasonable foundation." See also Annotation in 175 A.L.R. 882,914, et seq. for "cases in which the belief was externally inspired, but in which the circumstances so scantilly warranted it, or the incidents of it were so clearly abnormal, that insanity may be inferred." A host of cases are collated in the foregoing texts and need not be cited here.

The definition adopted by the courts of this state, supra, seems to be in harmony with the last-mentioned authorities. But whether we accept the view that a belief in a state of facts cannot be an insane delusion if there is any evidentiary basis for it, however slight or inconclusive, or the view that a belief in a state of facts cannot be an insane delusion unless there is no reasonable foundation for it, the result in this case must be the same.

■ Although they may have been mistaken in their belief, the evidence heretofore detailed clearly shows a reasonable and substantial factual basis for the belief held by both Mrs. Lou Lockhart and her husband, Judge G. E. Lockhart, that they had been denied all association with the respondent and the right of visitation with her and, to that extent, that they had "lost" her with all their expectations for sharing her love and affection in their declining years. The testimony of one witness is that Judge Lockhart had always spoken of and treated Jess Lockhart, respondent's father, as his own son—Jess had taken Mr. Lockhart's name—and the record discloses that he was more deeply moved and affected by his belief that the companionship of respondent was no longer available to them than was Mrs. Lockhart. With this substantial factual basis for Mrs. Lockhart's belief, the rule stated in 57 Am. Jur., supra, is applicable: "Obviously, a testator need not always be right in his deductions in order to avoid being classed as insanely deluded. * * * One cannot be said to act under an insane delusion if his condition of mind results from an inference or a process of reasoning, however illogical, from facts which are shown to exist." Navarro v. Rodriguez, Texas Civ. App., 235 S.W. 2d 665, no writ history.

We hold as a matter of law that the evidence in this case does not and cannot support a conclusion that Mrs. Lou Lockhart was a victim of an insane delusion at the time she made her will.

■ The testimony of a psychiatrist undoubtedly has a place in a case of this general character, and where the facts are such as to

leave the issue doubtful the testimony of an expert on mental diseases serves a useful and a wholesome purpose. But where the facts, when measured by the requirements of law, do not raise a jury issue, the testimony of an expert cannot make them raise it. Green v. Dickson, Texas Civ. App., 208 S.W. 2d 119, writ refused, n.r.e.; United States v. Hill, 8 Cir., 62 Fed. 2d 1022, 1025. Moreover, his testimony affirmatively shows that in arriving at his conclusion that Mrs. Lockhart was the victim of an insane delusion Dr. Hoerster used a test wholly different from that recognized in law. He treated a delusion and an insane delusion as one and the same thing and based his opinion on the premise that an insane delusion can be a false belief arrived at "through illogical reasoning" or an "illogical interpretation of the facts." This premise is exactly contrary to the rule of law quoted above. To invalidate a will the testimony offered for that purpose must meet the test prescribed by law. Watts v. Farmer, 63 Wyo. 332, 181 P. 2d 611, 617; 32 C.J.S. § 569, p. 403; 1 Page on Wills, supra, § 128. It follows that the trial court correctly instructed a verdict for petitioners.

Respondent suggests that Galindo v. Garcia, 145 Texas 507, 199 S.W. 2d 499 is controlling here. That case is distinguishable in that the testator entertained a belief that his daughter had "pushed him down" and there was no evidence whatever adduced to show a factual basis for the belief. The court held the issue to be one for the jury.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

Opinion delivered February 10, 1954.

Rehearing overruled March 10, 1954.